**ATTACHMENT A**

**STIPULATION OF FACTS**

*The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

**The Defendant and Related Individuals and Entities**

1. From in or around January 2015 through in or around September 2016, the Defendant Shira Uzan worked as a sales representative for Yukom Communications ("Yukom"), an Israel-based business that provided sales and marketing services, including "retention services," for the for two internet-based businesses with the brand names, BinaryBook brand and BigOption.

2. BinaryBook and BigOption representatives sold and marketed financial instruments known as "binary options" to customers located throughout the world, including in the United States and within the District of Maryland.

3. The Defendant was initially assigned to work at BigOption and reported to Lee Elbaz, who was the CEO of Yukom. Elbaz used the alias "Lena Green" when interacting with investors. Elbaz supervised representatives of BinaryBook and BigOption, at Yukom and elsewhere, who performed retention services on behalf of BinaryBook and BigOption. In addition to Yukom, Elbaz trained and supervised representatives employed by Numaris who also performed retention work on behalf of BinaryBook.

**Background on Binary Options and Related Definitions**

4. A "binary option" was a type of option contract in which the payout depended on the outcome of a discrete event, typically related to whether the price of a particular asset—such as a stock or a commodity—would rise above or fall below a specified amount. Unlike standard options, investors in binary options were not being given the opportunity to actually purchase a stock or a commodity but, rather, were effectively predicting whether its price would be above or below a certain amount at a certain time of the day. The option holder was typically promised that when the binary option expired, the option holder will receive either a pre-determined amount of cash or nothing.

5. A "conversion" representative was a salesperson responsible for converting a prospective binary options customer into an investor and obtaining an initial deposit of funds.

6. A "retention" representative was responsible for working with the investor going forward with the goal of obtaining additional deposits. As part of this effort, the Defendant and other retention representatives were responsible for educating clients on how to use the BinaryBook and BigOption platforms.

7. A "bonus" was an amount of purported funds that representatives of BinaryBook and BigOption could contribute to an investor's account to be used in trading.

8. A "risk free trade" or "insured trade" was a trade offered by representatives to investors in which the investors' accounts would be reimbursed by "bonus" funds in the event of a losing trade.

**The Defendant's Participation in the Conspiracy and Fraudulent Scheme**

9. The Defendant and other representatives of BinaryBook and BigOption, under the training and direction of Lee Elbaz and others, agreed to induce BinaryBook and BigOption investors to deposit funds based on material misrepresentations, including:

   i. false statements and material omissions regarding the alignment of financial incentives between investors and representatives—*i.e.*, claiming to represent the interests of investors when, in fact, they were not representing the interests of investors;

   ii. false statements and material omissions regarding the suitability of binary options as investments and returns on investments in binary options;

   iii. false statements and material omissions about the names, qualifications, and physical location of representatives assisting investors;

   iv. false statements and material omissions regarding investors' ability to withdraw investment funds and about the reasons that funds could not be withdrawn; and

   v. false statements and material omissions regarding—and the deceptive use of—so-called "bonuses," "risk free trades," and "insured trades."

10. BinaryBook and Big Option representatives communicated with investors through the internet and communicated with clients by email and telephone. The calls with clients were recorded and used for training purposes. Lee Elbaz reviewed the calls and used the recordings to show BinaryBook and BigOption representatives successful sales techniques.

11. BinaryBook and BigOption representatives were not representing the interests of investors: When investors lost money, the owners of BinaryBook and BigOption profited.

12. The Defendant's commissions were tied to how much money her clients deposited. Managers at BinaryBook and BigOption, in consultation with Lee Elbaz, would set sales goals for the staff. Sales representatives were rewarded with gift cards and other items for meeting sales goals.

13. BinaryBook and BigOption representatives falsely referred to themselves as "analysts" or "brokers" or "traders" to potential investors, when in fact they were sales representatives. In correspondence and other communications, the Defendant identified herself as a "Senior Account Manager," "Account Manager," "senior broker," and "qualified market analyst"

for BinaryBook and/or BigOption. The Defendant was not a broker or analyst and did not have a background in finance, business, or the financial markets.

14. The Defendant was assigned an alias while working on behalf of BinaryBook and BigOption. That alias was referred to internally as a "stage name." The Defendant used a so-called stage name during her time at BinaryBook and BigOption—"Emily Laski"—to interact with client investors, and she also falsely presented her location and professional qualifications to client investors.

15. For example, on or about July 14, 2015, the Defendant, on behalf of BinaryBook, sent an email to a client investor stating that her job was "to assist you in making profits from the very beginning." The Defendant knew that her job was not to help the client make money, but was in fact to encourage the client to deposit more money with the company. The Defendant knew that this statement was false at the time she made the statement.

16. On or about February 10, 2016, the Defendant, on behalf of BinaryBook, sent an email to a client investor stating that she was a "senior broker and qualified market analyst with 15 years' experience" and an "87% winning rate" on her trades. The Defendant knew that she did not have 15 years of experience or an 87% "winning rate," and she knew that these statements were false at the time she made them. These statements were drawn from one of several email templates accessible to Yukom employees for use when communicating with client investors.

17. On or about June 6, 2016, a BigOption representative and co-conspirator sent an email to another BinaryBook representative and co-conspirator attaching a training script titled "Objections Pitch." The Defendant did not author the script, but she was familiar with the content. The "Objections Pitch" included instructions to make following false representations:

> I only make money when you are profitable. Explain to them that you make 5% commission every time they withdraw profits.

The Defendant and her co-conspirators, representatives of BinaryBook and BigOption, actually earned commissions based on "net deposits"—*i.e.*, deposits minus withdrawals.

18. BinaryBook representatives received an email instructing sales people to target retired people, social security recipients, pension holders, and veterans as clients, and they were trained on possible alternative funding sources for target clients located in the United States. For instance, representatives received an email about so-called "social security loans," being informed that a 60-year-old retired person could receive funds for investment by taking out a loan against social security benefits. Representatives were also instructed that U.S. customers could receive a tax refund in or around April which could be an additional source of funds; and were advised to induce investors to take out so-called "pay day loans" and, as to veterans in particular, that veterans were eligible for loans that are non-taxable that could be used for investment.

19. The Defendant had direct contact with investors and induced clients to invest in binary options by falsely representing the return on investment, making unauthorized trades for clients, and using "bonuses" to convince clients to continue to deposit funds. The Defendant also attempted to prevent investors from withdrawing funds from their accounts.

i. In furtherance of the conspiracy, the Defendant and her co-conspirators directly communicated with investors within the District of Maryland.

ii. In furtherance of the conspiracy, the Defendant communicated with more than ten investors and was directly responsible for approximately $1,819,595 in investor losses.

SO STIPULATED:

_/s/ Laura Connelly_
Laura Connelly, Trial Attorney
Ankush Khardori, Trial Attorney
Tracee Plowell, Assistant Chief

_/s/ Shira Uzan_
Shira Uzan
Defendant

_/s/ Randy Sue Pollock_
Randy Sue Pollock, Esq.
Counsel for Defendant